UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>THEODORE MAYNARD HAMANN,<br><br>  Defendant. | Case No. 4:22-cr-00004-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Theodore Maynard Hamann's Motion to Suppress. Dkt. 20. On July 22, 2022, the Court held oral argument and took the motion under advisement. Upon review, and for the reasons set forth below, the Court DENIES the Motion.

## II. BACKGROUND

The facts of this case, for the most part, are not in dispute. On December 21, 2021, Pocatello Police Department ("PPD") Sergeant Nathan Diekemper observed a 2019 white Ford Ranger with California plates in front of a known drug house that was being observed as part of a drug investigation. Eventually, the vehicle's driver picked up a male and a female from the house.

Sergeant Diekemper contacted Idaho State Police ("ISP") Trooper Miguel Rivera and ordered him to "conduct a traffic stop on that white Ford Ranger." Dkt. 21, at 2. At the

hearing, Trooper Rivera testified that he did not recall being told that the individuals in the white Ford Ranger were part of a drug investigation.[1]

Here the account differs between the Government and Hamann. Hamann, who was driving the Ford Ranger, contends that he stopped—"albeit briefly"—at the intersection of Frontage and East County Roads near the Pocatello Airport. Dkt. 20-1, at 2. The Government contends that the Ford Ranger did not stop and instead rolled through the stop sign. Dkt. 21, at 2. Trooper Rivera testified that although he saw the brake lights illuminate, he noticed that the tires on the truck did not stop rolling. After reviewing the dashcam footage, the Court concludes that Hamann did not stop at the stop sign. Rather, Hamann rolled through the stop sign, in what is colloquially known as a "California stop."

From here, the accounts once again merge. Trooper Rivera reached the stop sign Hamann had rolled through and followed the Ford Ranger as it continued down the road. After a brief separation caused by another vehicle coming between Trooper Rivera and the Ford Ranger, Trooper Rivera conducted a traffic stop of the Ford Ranger at a nearby gas station for failure to come to a complete stop in violation of Idaho Code § 49-807.[2] Trooper Rivera reported that "[a]s the vehicle was coming to a stop, I could see all three occupants slightly moving their bodies from side to side. I found these movements suspicious and

---

[1] It is worth noting that Rivera's report did not mention the order from Diekemper. This omission, by itself, does not taint the search.

[2] Idaho Code § 49-807 reads in relevant part: "Except when directed to proceed by a peace officer or traffic-control signal, every driver of a vehicle approaching a stop sign shall stop . . . After having stopped, the driver shall yield the right-of-way to any vehicle in the intersection or approaching on another highway so closely as to constitute an immediate hazard during the time when such driver is moving across or within the intersection or junction of highways."

MEMORANDUM DECISION AND ORDER - 2

through my training and experience, consistent with someone who was attempting to conceal something prior to me making contact with them." Dkt. 20-3, at 2.

Trooper Rivera found three individuals in the truck. Hamann was driving. A male backseat passenger was not wearing a seatbelt and falsely identified himself as "Alexander Estrada."[3] The female passenger identified herself as "Samantha Diaz" and provided a date of birth. Trooper Rivera relayed the names and respective birthdates to dispatch via radio. While he awaited a reply, Sergeant Diekemper contacted Trooper Rivera to inform him that "Samantha" might be a false name used by Josephine Rose Hargrove-Diaz, who had an outstanding warrant for her arrest.[4] Trooper Rivera compared a picture of Josephine with "Samantha" and concluded that they looked very similar.

Trooper Rivera asked "Samantha" to step out of the truck, and after confronting her with his suspicions, she admitted that she was Josephine Rose Hargrove-Diaz. After Trooper Rivera arrested and handcuffed Hargrove-Diaz and advised her of her Miranda rights, Hargrove-Diaz stated that there was drug paraphernalia in the white Ford Ranger.

Trooper Rivera walked back to the truck, advised the two men of Hargrove-Diaz's arrest, and informed them that he would be retrieving the drug paraphernalia. Trooper Rivera observed that the two men "grew increasingly nervous." Dkt. 20-3, at 3. Deputy Ryan Anthony, who was providing back-up support, shouted a warning at Trooper Rivera,

---

[3] He was later identified as Brandon Alexander Estrella.

[4] "Samantha" is the name of Josephine's sister, and Josephine had used that alias during previous interactions with the police.

MEMORANDUM DECISION AND ORDER - 3

and Hamann then put the truck in drive and "accelerated away at a high rate of speed in a gas station parking lot where there were patrons close within proximity." Dkt. 20-3, at 3. Hamann was close enough that Trooper Rivera "was fearful that I would get my foot or leg ran over from the large Ford Ranger tire." Dkt. 20-3, at 3. Trooper Rivera pushed away from the accelerating truck and injured himself, feeling "a discomfort in my groin and right hip area." Dkt. 20-3, at 3.

Hamann fled toward the Michaud Creek area, eventually abandoning his truck on a remote dirt road after it became stuck in the snow. At the hearing, Detective Russell Gunter testified that he concluded the truck had been abandoned by the occupants because it was stuck in the snow, the reverse lights were on, the truck was running, the windows were down, and the keys were still in the ignition. Hamann was arrested approximately ninety minutes later.

After Hamann left his truck, ISP Sergeant Olsen and Detective Knudsen "began a towed vehicle inventory of the vehicle, in accordance with ISP policy." Dkt. 20-2, at 2. The officers located an IDOC badge for Estrella, a meth pipe, and a large, clear Tupperware container "with a large amount of methamphetamine," which was sitting in plain view on the back floor of the passenger compartment. Dkt. 20-2, at 3. At that point, the officers ceased their inventory search, sealed the vehicle, and obtained a state search warrant for the Ford Ranger. The officers then towed the Ford Ranger to an ISP Office where the vehicle was searched. The police discovered 1,188 grams of meth within the container. In a follow-up interview, Hamann admitted that he ran from officers because of the

methamphetamine in the vehicle and because he was involved in other drug activities in the area. Dkt. 20-1, at 6.

## III. LEGAL STANDARD

The Fourth Amendment protects citizens from unreasonable searches and seizures by the government. U.S. Const. amend. IV. The stop of a vehicle is a seizure of its occupants and is therefore subject to the Fourth Amendment standards. *E.g.*, *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Brendlin v. California*, 551 U.S. 249, 255 (2007); *Whren v. United* States, 517 U.S. 806, 809–10 (1996); *Berkemer v. McCarty,* 468 U.S. 420, 436–37 (1984) ("We have long acknowledged that stopping an automobile and detaining its occupants constitute a seizure." (cleaned up)). Under the Fourth Amendment, government officials may conduct an investigatory stop of a vehicle only if they possess "reasonable suspicion: a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (quotations omitted); *see United States v. Lopez–Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (Fourth Amendment requires reasonable suspicion, not probable cause, for traffic stop); *see also United States v. Wallace*, 213 F.3d 1216, 1219 n.3 (9th Cir. 2000) (as amended) (probable cause will also support traffic stop). Such reasonable suspicion "requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *Thomas*, 211 F.3d at 1189 (quotations omitted). Conduct that, when viewed individually, might be innocent behavior, when taken together, can form the basis of reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002); *United States*

*v. Valdes-Vega*, 738 F.3d 1074, 1080 (9th Cir. 2013) (en banc) ("A series of innocent acts may be enough for reasonable suspicion justifying an investigative stop.").

On the other hand, probable cause that a traffic violation or crime has been or is being committed makes a stop per se reasonable. *Whren v. United States*, 517 U.S. 806, 810, 813–15 (1996). "Probable cause exists 'when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" *United States v. Wallace*, 213 F.3d 1216, 1219. (9th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Notably, if an officer observes a traffic violation, that officer may conduct a traffic stop for that violation even if he also has another reason to suspect that a defendant is engaged in criminal activity. *United States v. King*, 244 F.3d 736, 738 (9th Cir. 2001).

The impoundment of a vehicle is also a seizure within the meaning of the Fourth Amendment. *U.S. v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016). But under the "community caretaking" doctrine, police may, without a warrant, impound and search a motor vehicle "so long as they do so in conformance with the standardized procedures of the local police department and in furtherance of a community caretaking purpose, such as promoting public safety or the efficient flow of traffic." *Id.* This requirement ensures that impoundments are conducted "on the basis of something other than suspicion of evidence of criminal activity." *Id.* "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

Another such exception to the warrant requirement is the "automobile exception" which permits police to search a vehicle when the car is "readily mobile" and where

"probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citation omitted). Even in the absence of an arrest, the police may search both an automobile and the containers within it "where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

A third exception to the general prohibition against warrantless searches is the "plain view" doctrine, which "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

While "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," *United States v. Leon*, 468 U.S. 897, 906 (1984), the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974). Under the exclusionary rule, "illegally seized evidence" cannot be used "against the search victim in a criminal trial." *Id.* at 350.

When a defendant challenges a warrantless search or seizure, the government bears the burden of establishing by a preponderance of evidence that the search or seizure did not violate the Fourth Amendment. *See United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951).

# IV. ANALYSIS

### A. Traffic Stop

Based on the dash cam footage of the traffic stop, the Court concludes that the Ford Ranger did not stop at the stop sign. Therefore, because Hamann committed a traffic violation of Idaho Code § 49-807, the stop was based on reasonable suspicion and was therefore legal. But even if the stop was illegal, Hamann's flight, the subsequent chase, and his endangerment of pedestrians dissipates any taint that might have resulted from that stop.

The District Court for the Northern District of California has explained that "[t]he issue is not whether a traffic violation actually happened, but whether the officer had probable cause to believe that such a violation happened. *United States v. Alexander*, 480 F. Supp. 3d 988, 994 n.1 (N.D. Cal. 2020). In that case, because the officer stated that he "saw Defendant roll a stop sign" and wrote that in his report, the officer had probable cause to believe Defendant had violated the California Vehicle Code. *Id.* This principle has been upheld by the Ninth Circuit. *See U.S. v. Banyavong*, 52 Fed. App'x 367, 368 (9th Cir. 2002). Here, Hamann claims he stopped at the stop sign, and Trooper Rivera testified that he believed Hamann rolled through the stop. Although the Court finds that Hamman did *not* stop at the sign (which makes the stop appropriate because a traffic violation did occur), Trooper Rivera's good-faith belief that Hamann rolled through the stop is also sufficient to establish probable cause for the traffic stop.

Alternatively, Hamann's subsequent flight dissipates any taint that might have resulted from the stop. This conclusion is dictated by *U.S. v. Garcia*, 516 F.2d 318 (9th


Cir. 1975). There, the defendant was ordered to stop at a checkpoint operated by the United States Border Patrol. *Id.* at 319. The defendant complied momentarily and then sped off. The officers gave chase, stopped the defendant, and found controlled substances in his vehicle. *Id.* The defendant argued that because the initial stop at the checkpoint was illegal, the seized evidence must be suppressed as fruit of the poisonous tree. The Ninth Circuit assumed that the initial stop was illegal but held that "the flight and high-speed chase clearly supplied probable cause to arrest [the driver] and then to search his car." *Id.* at 320. This holding was based on the principle that "where the illegal conduct of the police is only a necessary condition leading up to the suspect's act, no taint attaches to [the police officer's] conduct." *Id.* at 319. The Ninth Circuit noted that the "flight was the voluntary conduct of [the defendant]." *Id.* However, if the "suspect's act is the intended result of illegal police conduct, or ensuing police action, it is likely to prove tainted." *Id.* In other words, if the police initiated the traffic stop with the intent of causing Hamann to flee custody, then the original stop is likely tainted.

Here, there is no evidence that Trooper Rivera intended for Hamann to flee custody. Trooper Rivera's interview and arrest of Hargrove-Diaz and his declaration that he was going to search the Ford Ranger for drug paraphernalia were not done in a manner to provoke Hamann to flight. Indeed, Trooper Rivera was so close to the Ford Ranger when it took off that he was injured, and it seems unlikely that Trooper Rivera would deliberately provoke a flight while endangering himself. Accordingly, even if the original stop was illegal, the subsequent flight dissipates that taint. The Motion to Suppress is therefore

DENIED in regard to the traffic stop.[5]

## B. Vehicle Search

Here, the police meet multiple exceptions to the Fourth Amendment's warrant requirement to search the vehicle. First, the elements of the "community caretaking" or inventory search exception have been met because the vehicle was abandoned on a public roadway and Sergeant Olsen and Detective Knudsen searched the car in accordance with the ISP towing policy. Neither driver nor passengers could operate the truck because they had fled or been arrested. The officers' actions were also lawful under the plain view exception. When they looked inside the vehicle to begin their inventory search, Sergeant Olsen and Detective Knudsen clearly saw a methamphetamine pipe and a clear Tupperware container with methamphetamine on the back passenger floor.

Second, Sergeant Olsen and Detective Knudsen's actions were lawful under the automobile exception because Hargrove-Diaz told Trooper Rivera that there was drug paraphernalia in the car. Even though the searching officers did not personally interview Hargrove-Diaz, this knowledge can be imputed to them through the collective knowledge doctrine. *See United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007).

The Motion to Suppress is accordingly DENIED in regard to the vehicle search.

///
///

---

[5] Because Hamann failed to stop and the flight dissipates whatever taint *may* have existed, the Court will not rule on the Government's alternative arguments regarding the traffic stop, such as the collective knowledge doctrine as it may apply to Hamann's suspected drug activity. Dkt. 21, at 6.

## V. ORDER

1. Defendant's Motion to Suppress (Dkt. 20) is DENIED.

DATED: September 2, 2022

_____
David C. Nye
Chief U.S. District Court Judge